UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

CARL ALLEN,

                    *Petitioner*,

                                        **MEMORANDUM & ORDER**

            -*against*-

                                        16-cv-1285(KAM)(LB)

HAROLD GRAHAM, SUPERINTENDENT OF
AUBURN CORRECTIONAL FACILITY;

                    *Respondent*.

----------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

        On March 9, 2016, *pro se* petitioner Carl Allen
("petitioner") filed a petition for a writ of habeas corpus,
pursuant to 28 U.S.C. § 2254, in the United States District
Court for the Eastern District of New York, challenging his
November 2, 2012 conviction in the Supreme Court, Richmond
County, on one count of murder in the second degree. (*See* ECF
No. 1, Petition for Writ of Habeas Corpus ("Pet.").)  For the
reasons set forth below, the court finds petitioner's claims are
without merit, and denies and dismisses his petition.

## Background

### I.    1999 Murder of Ms. Ortiz

        Petitioner's November 2, 2012 conviction stemmed from
the murder of Noemi Ortiz ("Ms. Ortiz"). (Pet. at 1.)  On
September 4, 1999, Ms. Ortiz's boyfriend, Eric Donaldson
("Donaldson"), found Ms. Ortiz dead in her apartment, at 73 Wave

1

Street, Staten Island, New York, lying on the floor between her living room and bedroom.  (ECF No. 10-5, *People v. Allen*, Indictment No. 390/2010 (Richmond County Crim. Ct.), Trial Transcript ("Trial Tr."), at 83:8,14-17,20-22.)[1]  Ortiz had suffered several blunt force injuries to her head, neck, torso, and extremities, as well as numerous stab wounds to her neck and the right side of her head.  (*Id.* at 600:10-12.)  Large amounts of blood were found throughout the bedroom, on the walls, blinds, bedding, sheets, comforter, and doorknob; in addition, there were teeth on the floor and bloody palm prints on the walls.  (*Id.* at 301:8-25.)  The officers who arrived at the scene also discovered a blood-covered, green, plastic-coated dumbbell (*Id.* at 290:22-25), which, during the September 5, 1999 autopsy, the medical examiner determined to be the weapon used to inflict blunt force trauma to Ms. Ortiz.  (*Id.* at 604:21-24.)  During the autopsy, the medical examiner also collected rape kit evidence from Ms. Ortiz's body, and the swabs tested positive

---

[1] The caption "Trial Tr." refers to the criminal trial proceedings in *People v. Allen*, dated October 16 through November 2, 2012. The trial transcripts are available at ECF Nos. 10-5 through ECF No. 10-16, and correspond to the trial dates as follows: ECF No. 10-5, ECF pp. 1-138(October 16); ECF No. 10-6, pp. 139-247(October 17); ECF No. 10-7, ECF pp. 248-338 (October 18); ECF No. 10-8, ECF pp. 339-448 (October 19); ECF No. 10-9, ECF pp. 449-543 (October 22); ECF No. 10-10, ECF pp. 544-641 (October 23); ECF No. 10-11, ECF pp. 642-738(October 24); ECF No. 10-12, ECF pp. 739-880 (October 25); ECF No. 10-13, ECF pp. 881-948 (October 26); ECF No. 10-14, ECF pp. 949-953 (October 31); ECF No. 10-15, ECF pp. 954-971 (November 1); ECF No. 10-16, ECF pp. 972-980 (November 2). Citations to the trial proceedings from October 16 through November 2 correspond to the transcript pagination (1 to 980).

for semen.  (*See* ECF No. 6-10, State Court Record, Attachments to Opposition to Motion to Dismiss ("Attachments"), at 11; Trial Tr. at 668-670.)[2]  The cause of death was found to be homicide. (Attachments at 49, 57; Trial Tr. at 610:11.)

Following the autopsy, an officer from the Crime Scene Unit returned to Ms. Ortiz's apartment and recovered the dumbbell.  (*Id.* at 306:19-25.)  Additionally, the Crime Scene Unit recovered the aforementioned bloody palm prints by cutting the sheetrock of the prints out of the walls as well as the blood-covered doorknob.  (*Id.* at 308: 17-23.)

Around the same time, a NYPD criminalist tested several items found in Ms. Ortiz's apartment for readable prints: a manila envelope, a plastic rotisserie chicken container, the doorknob, the dumbbell, a mop, a bleach container, a light switch, and the two pieces of sheetrock. (Trial Tr. at 459:22-25; 460:11-12; 461:5-6, 12-19, 20-21; 462:19-25; 464:5-7, 21-23; 465:1-3, 6-9; 466-467.)  The criminalist visually examined each item, looking for ridge details in the prints that could be compared and identified. (*Id.* at 24-27.)  She photographed any visible prints she determined to be "potentially of value" and sent them to NYPD property clerk's office for a secondary evaluation.  (*Id.*)

---

[2] The caption "Attachments" refers to the attachments to the government's opposition to petitioner's motion to dismiss, available at ECF No. 6-10. Citations to the record correspond to the transcript pagination (1 to 57).

In addition, Detective Michael McLoughlin assisted with the ongoing investigation by taking palm prints of more than 30 suspected individuals. (Trial Tr. at 272:17-22; 274:9-18.) Detective McLoughlin testified that on September 11, 1999, he and another detective met with and questioned petitioner regarding Ms. Ortiz's murder and whether he owed Ms. Ortiz money; petitioner denied both having a romantic relationship with Ms. Ortiz and owing her money. (*Id.* at 29-31; *see also* Attachments at 53-54.) The detectives then asked petitioner to accompany them to the precinct so they could obtain a set of petitioner's palm prints from him. (Attachments at 53.) Petitioner stated that he was preparing dinner for his children and would need to find a babysitter, but he would be happy to meet the detectives at the precinct in an hour. (*Id.*) Petitioner failed to arrive at the precinct at the designated time. (*Id.*) The detectives called petitioner's residence, and an unidentified female informed them that petitioner had left the residence and would not be going to the precinct. (*Id.*)

Detective McLoughlin made numerous attempts to reach petitioner through his beeper and, after approximately two hours, the detectives received a call from petitioner, who stated that he would not be coming to the precinct that evening. (*Id.* at 54). Petitioner informed the detectives that he retained legal counsel, and would be coming in with said counsel

on Monday, September 13, 1999, to be interviewed and fingerprinted.  (*Id.*)  Petitioner did not show up to the precinct as he had indicated.  (*See* ECF No. 6-9, Government's Opposition to Motion to Dismiss, ("Opp. to Mot. to Dismiss"), at 13; *see also* ECF No. 6-8, Petitioner's Motion to Dismiss ("Pet. Speedy Trial Mot."), at 17.)

The investigation continued, but the police could not find petitioner after their September 11, 1999 correspondence and interactions.  (*See* Attachments at 54; Opp. to Mot. to Dismiss at 13.)  Between October 1999 and November 2001, the police ran US postal checks, DMV checks, and arrest reports in an effort to locate petitioner, which were unsuccessful.  (*Id.*; *see also* Attachments at 21-27.)

## II.  Petitioner's 2003 Arrest and Release

On April 25, 2003, petitioner was arrested on unrelated rape charges.  (ECF No. 5, People's Affidavit in Opposition to Writ of Habeas Corpus ("Aff. in Opp.") ¶ 6; Pet. Speedy Trial Mot. at 17.)  In connection with that arrest, petitioner's palm prints were taken and submitted for comparison with an unidentified bloody palm print from the Ortiz murder scene.  (*See* Opp. to Mot. to Dismiss at 14.)  Later that day, the relevant police squad was informed that petitioner's palm

prints matched the bloody palm print from the Ortiz murder scene. (*See id.; see also* Attachments at 49, 55.)

Petitioner was arrested for Ms. Ortiz's murder on the same day. (*See* Opp. to Mot. to Dismiss at 14.)  The detectives read petitioner his *Miranda* rights, which petitioner voluntarily waived, and petitioner was then interviewed by the detectives. (*See* Attachments at 55-56.)  Petitioner admitted to knowing Ms. Ortiz, but he refused to provide any other information to the detectives. (*See id.* at 53-54.)  Respondent asserts that, after petitioner's arrest, the assigned assistant district attorney ("ADA") reviewed the casefile and saw that the print on the dumbbell was still unidentified. (*See* Opp. to Mot. to Dismiss at 15.)  As such, the ADA decided not to proceed with the murder charges against petitioner and, instead, to develop more evidence or identify the dumbbell print. (*Id.*)

On May 1, 2003, petitioner was released on the homicide case docket pending in Richmond County Criminal Court; however, petitioner remained incarcerated for the unrelated later rape charge. (*Id.*)  Later in May 2003, the murder case was waived to the Grand Jury, and there were no court appearances until 2010. (*See id.* at 15-16; *see also* Pet. Speedy Trial Mot. at 17.)  On August 14, 2003, petitioner pled guilty in the rape case, and, on September 9, 2003, petitioner was

sentenced to a one-year term of imprisonment.  (*See* Opp. to Mot. to Dismiss at 16.)

### III.  <u>Interim Investigation</u>

On May 8, 2003, respondent obtained an order for petitioner's DNA to be tested and compared to evidence collected from Ms. Ortiz's rape kit.  (Opp. to Mot. to Dismiss at 17.)  On July 15, 2003, a DNA report revealed a match between petitioner's sample and the semen sample obtained from Ms. Ortiz's autopsy.  (*See* Attachments at 5-9.)  In late 2004, an ADA from the Richmond County DA's office requested a crime reconstruction in the case from the Forensic Analysis and Reconstruction Unit ("FARU").  (*Id.* at 46.)  The unit reviewed various NYPD reports, DNA reports, autopsy reports, and photographs of the crime scene.  (*Id.*)  On January 3, 2005, FARU issued a report, which noted that the palm print on the wall was consistent with petitioner's palm print, but it could not be determined if the particular print was made before or after the blood had spattered on the wall.  (*Id.*)

In 2006, a new ADA was assigned to the case.  (Opp. to Mot. to Dismiss at 19-20.)  The ADA contacted the NYPD Cold Case Squad for assistance with the investigation and met with a detective from that squad on May 4, 2007 to discuss the case. (*Id.* at 20-21.)  On May 8 and June 30, 2007, the detective made requests to compare the unidentified dumbbell print with the

prints of the mother of petitioner's children and the petitioner's girlfriend, respectively.  (*See id.* at 21; *see also* Attachments at 28-29.)

In August 2007, the ADA worked with two detectives of the NYPD Major Case Print Lab regarding the Ortiz case.  (Opp. to Mot. to Dismiss at 21.)  One of the detectives determined the dumbbell print to be of "no value" and informed the ADA that although an NYPD print report had initially listed the dumbbell print as being "of value," said designation was only a criminalist's preliminary determination and could be reversed. (*See id.; see also* Trial Tr. at 538:7-8, 20-23; 539:11-21; 540:16-24.)

The cold case detective made unsuccessful efforts throughout September and October 2007 to locate petitioner, including visiting petitioner's registered address and his place of employment.  (*See* Attachments 30-42.)  On October 3, 2007, the ADA and cold case detective met with the print lab detective to discuss his finding of "no value" for the dumbbell print and the print's unreadability.  (Opp. to Mot. to Dismiss at 24-25.) Of the prints initially determined to be "potentially of value" by the 1999 criminalist, the print lab detective found several to actually be "no value" — the manila envelope, the doorknob, the dumbbell — and two "of value," but identified as Ortiz's — the plastic rotisserie chicken container and the headboard.

(Trial Tr. at 584-87.)  The print lab also informed the ADA that there was a second palm print from the crime scene that had not yet been examined.  (*See* Opp. to Mot. to Dismiss at 25.)  The ADA requested a comparison of the unexamined palm print with all known prints and, several days later, the print was identified as belonging to petitioner.  (*Id.; see also* Attachments at 52.)

Throughout 2008, the cold case detective located, met, and interviewed various individuals associated with the case. (*See* Opp. to Mot. to Dismiss at 26.)  In August 2009, the ADA retained an independent forensic fingerprint analyst to re-examine the case prints.  (*See id.* at 26-27.)  The analyst's report was completed on January 29, 2010, and it confirmed the NYPD lab's finding that both bloody palm prints matched the petitioner's prints and that the dumbbell print was insufficient to identify an individual and was therefore of "no value." (Attachments at 43-44.)

**IV.  <u>Criminal Proceedings</u>**

**A. Indictment**

The DA's office decided to proceed with the murder charges and on December 2, 2010, petitioner was indicted by a Grand Jury for Murder in the Second Degree (N.Y. Penal Law § 125.25(1)).  (*See* Pet. Speedy Trial Mot. at 17-18.)

**B. Motion to Dismiss**

On March 30, 2011, petitioner filed an omnibus motion seeking, *inter alia*, dismissal of the indictment on speedy trial and due process grounds. (*See generally* Pet. Speedy Trial Mot.; Aff. in Opp. ¶ 11.) Petitioner's due process claim focused on the delay between the 1999 crime and 2003 arrest. (*Id.*) The speedy trial claim was directed at the delay between the 2003 arrest and the indictment in 2010. (*Id.*) By Decision and Order dated June 23, 2011, Justice Leonard P. Rienzi denied petitioner's motion on the grounds that the seriousness of the murder weighed against dismissal, and that the State had satisfied its burden of proof by showing that any delays were made in "good faith." (ECF No. 6-11, Decision and Order from Justice Rienzi, Richmond County, Supreme Court ("Rienzi Order"), at 1.) In denying the motion, Justice Rienzi also noted that petitioner had only been incarcerated for six days, concurrent with his incarceration for an unrelated rape case, and that petitioner's claimed prejudice resulting from the delays was unsubstantiated. (*Id.*)

### C. Jury Selection

Jury selection began on October 10, 2012. (ECF. No 10-1, Pre-Trial Proceedings and Jury Selection ("Voir Dire"), at 28-85.)[3] On October 11, 2012, a clerk brought to Justice Robert

---

[3] The caption "Voir Dire," refers to the transcript for pre-trial proceedings and jury selection, which took place beginning October 10 through October 15, 2012. Jury Selection transcripts are available at ECF No. 10-1, ECF pp. 1-85

Collini's attention that a December 7, 2010 article about petitioner and Ms. Ortiz's murder, which had been reprinted from the internet and indicated an AOL screen name on the bottom, had been found on a table in Central Jury. (Voir Dire at 91-109, 110-11.) Petitioner's counsel moved to dismiss the panel on the basis that the article was prejudicial because it included information about the details of the case and petitioner's prior rape conviction. (*See id.* at 111:20-25, 112.) Petitioner's counsel argued that no juror would admit to reading it for fear of punishment. (*Id.;* Aff. in Opp. ¶ 25.)

Justice Collini inquired about the screen name, and one prospective juror, Margaret McInery, admitted it was hers. (*Id.* at 115:12-25, 116-17.) She was questioned outside the presence of the other prospective jurors, and she admitted she had come across the article when researching a witness named at the beginning of jury selection. (*Id.* at 115.) She admitted reading the article, but she denied showing it to or discussing it with other prospective jurors. (*Id.* at 116-17.) She acknowledged that having read the article would affect her ability to be fair and impartial in the case. (*Id.* at 117:6-8.)

---

(October 10), ECF No. 10-2, ECF pp. 86-166 (October 11), ECF No. 10-3, ECF pp. 167-314 (October 12), ECF No. 10-4, ECF pp. 315-372 (October 15).

Justice Collini excused Mrs. McInery from the panel.  (*Id.* at 117:9-10.)

The court then consulted with the parties and settled on two questions to ask the prospective jurors: (1) "whether or not anybody in this room has discussed this case today with [the aforementioned juror];" and (2) whether anyone "has [] done any internet research or read any internet articles about this case or done any investigation with respect to any of the parties on the internet or anywhere else with respect to this case." (*Id.* at 120:5-10, 121:3-6.)  Five prospective jurors who indicated that they had done one of the two were asked to stay, and the court temporarily dismissed the rest of the panel from the room. (*Id.* at 121-22.)

Only one prospective juror, Alan Crecca, admitted to reading the article, but stated that it would not affect his ability to be fair and impartial in deciding the case.  (*Id.* at 122:8-12, 13-16.)  Mr. Crecca later returned to the courtroom to say that he would not be able to put the article out of his mind to fairly and impartially decide the case.  (*Id.* at 136:4-15.) He was excused from the panel.  (*Id.* at 136:16.)

Another prospective juror admitted he had done some internet research on his own, but he had not been able to find any articles.  (*Id.* at 122:25, 123:1-6.)  He was dismissed to join the rest of the panel.  (*Id.* at 123:25, 124:1-4.)  A third

prospective juror explained that she worked for the Staten
Island Advance, the publication that had published the article
and remembered that articles had been written about the case,
and was also excused from the panel. (*Id.* at 124-126.)

A fourth prospective juror was excused because he knew
of the case when it occurred in 1999, and had done internet
research on the case during the previous night, and admitted
that he would be unable to fairly and impartially decide the
case. (*Id.* at 127-28.)  Prospective juror Donna Lefkowitz
stated that she had not read any articles about the case and did
not use the computer at all. (*Id.*)  Without further inquiry as
to whether she had spoken with Ms. McInery, the court dismissed
her from the room to join the panel. (*Id.* at 129; Aff. in Opp.
¶ 30.)

Another prospective juror, Marilyn Rubbo, stated that
though she had not read any articles or done any research, she
and two others had overheard Mrs. McInery talking in the jury
room. (*Id.*)  Ms. Rubbo stated that "[Ms. McInery] just made one
statement that stuck in my head about the defendant." (*Id.* at
129:23-24.)  Nonetheless, Ms. Rubbo believed that she could put
the statement out of her mind and be impartial. (*Id.* at 130:1-
5.)  Two other prospective jurors, Elena Startseva, and Leslie
Braggs, stated that they had heard Ms. McInery speak about the
case, but described it as "a brief talk," and stated that they

13

would be able to fairly and impartially decide the case.  (*Id.* at 132-35; 134:16-18.)

Petitioner's counsel sought a for-cause challenge for Ms. Rubbo, which was granted on the basis of her difficulty understanding the court's inquiry as well as the length of time that lapsed before she stated that she could be impartial.  (*Id.* at 139:17-23, 140:9-10; Aff. in Opp. ¶ 33.)  Petitioner's counsel then renewed his request for the entire panel to be dismissed.  (*Id.* at 142-43.)  The court denied the request on the basis that the court's inquiry was standard procedure and sufficient.  (*Id.*)  The court returned the panel to the courtroom and reiterated its inquiry of whether any jurors had done any investigation into the case, to which no one responded.  (*Id.* at 143-44.)

During round two of jury selection, both Ms. Startseva and Ms. Braggs were seated.  (*Id.* at 168.)  They both stated that they could "keep an open mind" when listening to the testimony, and taking defendant's criminal convictions into account.  (*Id.* at 219:9-11.)  The government challenged Ms. Startseva for cause, on the grounds that she had a family member with an arrest history, and she gave confusing answers.  (*Id.* at 227.)  Defense counsel opposed the government's challenge, and the court denied the challenge.  (*Id.* at 228.)  The State then peremptorily challenged her.  (*Id.* at 231.)  Neither side

questioned nor peremptorily challenged the Ms. Braggs from the trio. (*Id.* at 224-27, 232.)  Jury selection ended on October 15, 2012, without the defense exhausting its peremptory challenges. (*Id.* at 365.)

### D. Verdict and Sentencing

After a ten-day trial, the murder charge was submitted to the jury. (Trial Tr. at 911:6-11, 12-22.)  On November 2, 2012, the jury found petitioner guilty of Murder in the Second Degree, NY Penal Law § 125.25(1). (*Id.* at 976:24-25 - 978.)  On January 10, 2013, the court sentenced petitioner to 25 years to life in prison. (ECF. No 10-17, Sentence Hearing, ("Hearing") at 16.)

### V.    Post-Conviction Proceedings

### A. Direct Appeal

On March 16, 2015, petitioner, through his appellate counsel Lynn W. L. Fahey, Esq., directly appealed his conviction and sentence. (*See* ECF. No 6-1, Brief for Defendant-Appellant ("Appellate Brief").)  Petitioner appealed on the basis that: (1) he was denied due process of law and a speedy trial due to the seven-year delay between his initial arrest and the indictment; (2) he was denied his right to a fair and impartial jury because the court did not dismiss the jury venire; and (3) he was denied his right to effective assistance of counsel

because his counsel did not use a peremptory challenge to remove one of the jurors. (*Id.*)

On December 2, 2015, the Appellate Division, Second Department affirmed the trial court's judgment of conviction. *See People v. Allen,* 134 A.D.3d 730 (2d Dep't 2015). The Appellate Division found that, though there had been an extensive delay, "the People met their burden of demonstrating good cause for the delay." *Id.* at 731. The Appellate Division further noted that "defendant was incarcerated on this charge for only six days before his indictment, which period was concurrent with his incarceration on an unrelated charge, and the defendant failed to demonstrate significant prejudice from the delay." *Id.* Lastly, the Appellate Division also found that the trial court had "providently exercised its discretion" in questioning the jurors about their potential exposure to the news article, and the "defense counsel's failure to exercise a peremptory challenge . . . did not constitute ineffective assistance of counsel." *Id.*

On December 22, 2015, petitioner sought leave to appeal to the New York Court of Appeals. On February 25, 2016, the Court of Appeals denied petitioner's application. *People v. Allen*, 26 N.Y.3d 1107 (N.Y. 2016).

### B. Petition for Habeas Relief

On March 9, 2016, petitioner, proceeding *pro se*, filed the instant petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. (*See generally* Pet.)[4]  Petitioner asserts that relief is warranted on the same grounds he raised in his direct appeal, which were rejected by the Appellate Division: (1) petitioner's rights to due process and a speedy trial were denied due to a seven-year delay between his arrest in 2003 and his indictment in 2010; and (2) he was denied his right to a fair and impartial jury due to the jury's exposure to pretrial publicity and consequently, the state trial court's refusal to dismiss the entire venire as a result; and (3) he was denied his right to effective assistance of counsel due to his trial defense counsel's failure to peremptorily challenge a prospective juror who had been exposed to pretrial publicity. (*See id.* at 2.)

Petitioner requests an expedited ruling and evidentiary hearing pursuant to 28 U.S.C. § 1657 and any other appropriate relief. (*Id.*)  Respondent filed his affidavit and memorandum in opposition on June 3, 2016, (ECF No. 5, Aff. in

---

[4] On November 15, 2013, *pro se* petitioner initially filed a petition in this court, for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. *See Allen v. Graham,* No. 13-cv-6317 (KAM) 2013 WL 6244712, at *1 (E.D.N.Y. Dec. 2, 2013).  Because petitioner's direct appeal in the Appellate Division, Second Department was pending at the time, the court dismissed the petition without prejudice on the grounds that petitioner had not exhausted all of his state remedies.  *Id.* at 2.

Opp., and 5-1, Memorandum in Opposition ("Opp. Mem.")) and petitioner filed his reply on July 5, 2016. (ECF No. 7, Reply ("Reply").)

## Standard of Review

A petition for a writ of habeas corpus filed by a person in state custody is governed, *inter alia*, by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2254.  Section 2254 provides that "a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The application shall not be granted to any claim adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Clearly established Federal law" is comprised of "the holdings, as opposed to the *dicta*, of [the Supreme] Court's

decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 413. In order to find that the state court's adjudication constituted "an unreasonable application of" a Supreme Court holding, the district court must conclude that "the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] the principle to the facts of the prisoner's case." *Id*.

"[T]his standard is difficult to meet ... because it was meant to be." *Harrington v. Richter,* 562 U.S. 86, 102 (2011). "[F]ederal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." *Greene v. Fisher,* 565 U.S. 34, 43 (2011) (quoting *Harrington*, 562 U.S. at 102-03) (internal quotations marks omitted).

In reviewing the instant petition, the court is mindful that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded,

must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted); *Williams v. Kullman,* 722 F.2d 1048, 1050 (2d Cir. 1983) (noting that courts should review *pro se habeas* petitions "with a lenient eye"). Accordingly, the court is obliged to interpret petitioner's pleadings as raising the strongest arguments they suggest. *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009); *Martin v. United States,* 834 F. Supp. 2d 115, 118 n.1 (E.D.N.Y. 2011) (citing *Williams,* 722 F.2d at 1050).

## Discussion

### I.   Denial of Rights to Due Process and a Speedy Trial

#### A. Speedy Trial

##### i.   Legal Standard

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to speedy trial.  U.S. Const. amend. VI; *see also Barker v. Wingo*, 407 U.S. 514, 515 (1972). The Supreme Court has identified four factors to guide a court's determination when approaching speedy trial claims: (1) the "[l]ength of the delay"; (2) "the reason for the delay"; (3) "the defendant's assertion of his right"; and (4) "prejudice to the defendant" from the delay.  *Barker*, 407 U.S. at 530.  No one factor is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial."  *Id.* at 533.

Rather the factors "must be considered together with such other
circumstances as may be relevant," and "courts must still engage
in a difficult and sensitive balancing process" to determine
whether the right has been violated.  *Id.*

### ii.  Application

Petitioner asserts, as he did on direct appeal, he was
denied his right to a speedy trial due to the seven-year delay
between his 2003 arrest and his indictment in 2010.  (Pet. at
3.)  Petitioner largely bases this claim on a pre-trial motion
he filed during his criminal case in Richmond County Supreme
Court.  (*See* Pet. Speedy Trial Mot.)  He contends that the delay
was the result of the "police and prosecutors being negligent,
careless, and prejudicial towards the evidence and petitioner's
constitutional rights."  (Reply at 2.)  Respondent contends that
the Appellate Division "undertook [the requisite] sensitive
balancing process and rejected petitioner's claim on the merits"
and "is therefore entitled to this Court's deference."  (Opp.
Mem. at 12.)

For the reasons set forth below, the court finds that
the state court's determination, that petitioner's right to a
speedy trial was not violated, was neither contrary to, nor
involved an unreasonable application of, clearly established
federal law, nor did it entail an unreasonable determination of

the facts.  28 U.S.C. § 2254(d)(1)-(2); *see also Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002).

Upon deciding petitioner's 2011 motion to dismiss, Justice Rienzi applied New York's prevailing *Taranovich* balancing test for speedy trial violations, which includes: (1) the extent of the delay; (2) the reasons for the delay; (3) the nature of the underlying charge; (4) whether there has been an extended period of pretrial incarceration; and (5) whether there is any indication that the defense has been impaired by reason of delay.  *People v. Vernace*, 96 N.Y.2d 866, 887 (2001) (citing *People v. Taranovich*, 37 N.Y.2d 442, 445 (1975)).

Although the *Taranovich* test and the *Barker* test are not identically phrased, courts have noted that they are essentially "identical."  *See Gathers v. New York*, No. 11-CV-1684 (JG), 2012 WL 71844, at *12 (E.D.N.Y. Jan. 10, 2012) ("Although the *Taranovich* factors and the *Barker* factors are not identically phrased, they are essentially identical tests.") (internal citation omitted); *Smith v. Maher,* 468 F.Supp.2d 466, 474 (W.D.N.Y.2006) ("The *Taranovich* factors essentially mirror the four-part inquiry outlined by the Supreme Court in *Barker v. Wingo* to determine whether a defendant's speedy trial right had been violated by prosecutorial delay ....."); *see also Frazier v. Czarnetsky,* 439 F. Supp. 735, 736–37 (S.D.N.Y. 1977).  Thus, application of the *Taranovich* factors is not "'contrary to' the

federal law clearly established by *Barker*."  *Gathers*, 2012 WL
71844, at *12 (citing *Garcia v. Annetts,* No. 9:08-CV-0736 (LEK)
(RFT), 2011 WL 4810012, at *6 (N.D.N.Y. Sept. 1, 2011).
Nevertheless, the court independently reviews the state court
record and applies the relevant factors.

### 1. The Length of the Delay

"[T]he lower courts have generally found post-
accusation delay 'presumptively prejudicial' at least as it
approaches one year."  *See Doggett v. United States*, 505 U.S.
647, 652 n.1 (1992) (finding a delay of eight and a half years
was "presumptively prejudicial" and warranted relief).  Though
respondent acknowledges that the seven-year delay here is
undeniably long, he argues that the "length does not, standing
alone, establish violation of the [speedy trial] right, in light
of the seriousness of the offense." (Opp. Mem. at 13.)  The
court agrees, but finds that close scrutiny of the other factors
is warranted.  *Doggett*, 505 U.S. at 652.

Though "there is no precise formula for determining
what constitutes a presumptively prejudicial delay," in the
present case, a lengthy pretrial delay is less likely to be
considered a violation of defendant's Sixth Amendment right to a
speedy trial because petitioner was found guilty of the serious
crime of murder in the second degree.  *See Micolo v. New York*,
No. 07-CV-0449 (JS), 2010 WL 3310721, at *8 (E.D.N.Y. Aug. 18,

2010); *see also Barker*, 407 U.S. at 531 ("[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex. . . charge."). The seriousness of the offense is further demonstrated by the fact that there is no statute of limitations in New York for murder. *See* C.P.L. § 30.30(3) (the New York State Legislature excluded murder and manslaughter from its statutory speedy trial requirements); *see also People v. Wiggins*, 31 N.Y.3d 1, 11 (2018) (discussing the inapplicability of CPL § 30.30 to a charge of murder in the second degree). As such, the courts of the Second Circuit have repeatedly held, in murder and manslaughter cases, that lengthy delays do not violate a defendant's speedy trial rights where the prosecution has shown good cause for the delay and the defendant has not suffered prejudice. *See Rayborn v. Scully*, 858 F.2d 84, 89 (2d Cir. 1988) (seven-year delay between arrest and trial was not a speedy trial violation); *see also Vernace*, 96 N.Y.2d at 887-88 (finding defendant's speedy trial rights were not infringed because the People had established good cause for seventeen-year preindictment delay in a double murder prosecution); *Decker v. Heath*, No. 10-CV-03294 (NGG), 2012 WL 2374639, at *3-4 (E.D.N.Y. June 22, 2012) (finding a fifteen-year delay between the indictment and the murder conviction did not violate defendant's right to a speedy trial); *People v. Keating*, 183 A.D.3d 595, 161 (2d Dep't 2020) (finding speedy

24

trial right was not violated because "while the lengthy delay is relevant to the consideration of prejudice suffered by the defendant from said delay, the defendant failed to demonstrate specific impairment to his defense . . . and the nature of the charge, murder in the second degree, was very serious") (internal quotations omitted).

Further, as respondent argues, there is no evidence that the People had ulterior motives in delaying the prosecution of Ms. Ortiz's murder, and a lengthy delay "may also work against the prosecution as the passage of time can make it more difficult for the People to meet their burden of proof." (Opp. Mem. at 13 (citing *People v. Decker*, 13 N.Y.3d 12, 15 (2009); *see also United States v. Marion*, 404 U.S. 307, 322 (1971) (delay poses risk to defendant but "may also weaken the Government's case").)

Thus, though the seven-year lengthy delay is "presumptively prejudicial," and requires consideration of the other factors, it does not by itself demonstrate that petitioner's right to speedy trial was violated. *Doggett*, 505 U.S. at 652; *Barker*, 407 U.S. at 530-31.

### 2. Reasons for the Delay

"The second factor, the reason for the delay in bringing the defendant to trial, asks [the court] to consider whether the delay was deliberate, neutral, or valid." *United*

*States v. Black*, 918 F.3d 243, 260 (2d Cir. 2019) (citing *Barker*, 407 U.S. at 531).  Furthermore, a "neutral delay 'such as negligence or overcrowded courts' [is counted] against the government because 'the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.'"  *Id.* (quoting *Barker*, 407 U.S. at 531); *see also Doggett*, 505 U.S. at 657 ("Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun.").

The court must review trial court determinations of negligence with "considerable deference." *Doggett*, 505 U.S. at 652.  Here, Justice Rienzi found that there were "cogent reasons" for the delay, and the Appellate Division affirmed this finding as well.  (Rienzi Order at 2; App. Div. Decision at 2.) The court finds that the state courts' determinations were not "objectively unreasonable in light of the evidence presented in the state-court proceeding," *see Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003), nor "manifestly contrary to common sense." *Anderson v. Miller*, 346 F.3d 315, 324 (2d Cir. 2003); *see also Davis v. Kelly*, 316 F.3d 125, 127 (2d Cir. 2003) (accepting finding of fact about reasons for delay in speedy trial

context); 28 U.S.C. § 2254(e)(1) (stating a state court's determinations of fact shall be "presumed to be correct.")

Petitioner points to several periods of inactivity in the record,[5] which allegedly belie respondent's assertion that "[t]he investigation was painstaking, but no less diligent" and, if anything, indicates negligence in the substantial delay of bringing petitioner to trial.  (Reply at 3.)  Asserting respondent's "inattentiveness" and misconduct, petitioner points to: (1) the realization that the dumbbell print was not "of value" in August 2007, despite it being in the State's possession as possible evidence since 1999; and (2) the second set of wall prints being compared to petitioner's prints for the first time in 2007, despite it being in the State's possession as potential evidence since 1999.  (Reply at 3-4.)

Justice Rienzi found that "the People acted in good faith when they decided not to initially prosecute" because in 2003, "the People believed that the case was a 'weak[] circumstantial case' because of the palm print on the dumbbell (Rienzi Order at 6), and there was no evidence suggesting

---

[5] Petitioner points to these periods of inactivity in the record: (1) June 2004 through early 2005; (2) early 2005, when the initial prosecutor requested a lab report, through 2006; (3) 2006, when the new prosecutor was assigned and ordered new documents, through 2007; and (4) May 4, 2007 when a cold case detective picked up the NYPD case file from the basement of the 120 squad; (5) October 6, 2007 when the second palm print was analyzed for the first time, and the prosecutor declared it "new evidence" when the police had had this print since 1999; (6) February 2008 through later that year; (7) end of 2008 through August 2009; (8) August 2009 when the independent investigator was hired.  (Reply at 3-4.)

petitioner's involvement when the crime first occurred because "neither his palm prints nor his DNA sample were on file." (*Id.* at 2.) As such, the People's "investigation at that time could not go further." (*Id.*) On balance, the court agrees.

In an almost factually identical case, the Second Department found that the "People acted in good faith in deferring commencement of the prosecution until after they were able to match the defendant's DNA profile with the one found on some of the blood-stained items recovered from the crime scene." *People v. Innab*, 182 A.D.3d 142, 145 (2d Dep't 2020). Though defendant makes a similar argument that like in *Innab*, the testing should have been done years earlier, "there is nothing to suggest that such tests would have yielded any meaningful information, as the defendant's own DNA profile was not available to investigators for comparative purposes until it was entered into CODIS" in 2003. (*Id.* at 146; Opp. to Mot. to Dismiss at 14.)

In 2003, after petitioner's palm prints were obtained following his arrest for the unrelated rape charge, the People did not immediately proceed with the murder case even though petitioner's palm prints "allegedly matched the bloody palm prints from the wall." (Rienzi Order at 6.) As noted in the record, the 2003 latent print reports only reference one set of prints—"One Sheet Rock (TS-9)"—and indicate that they tested

positively when compared against petitioner's left palm print. (Attachments at 51.)  The later 2007 report indicates that the latent prints matched with petitioner's right palm print.  (*Id.* at 52.)

Respondent has conceded on appeal that "[w]ith the benefit of hindsight, clearly, the NYPD Major Case Lab compared one palm print, and after finding a match, simply stopped." (Appellate Brief at 35).  However, the People had a good reason for choosing not to proceed with an indictment -the prints did not match the so-thought crucial "palm print on the dumbbell." (Rienzi Order at 6.)  Even so, the government still called for submission of additional suspect prints to test for comparison to the existing crime scene prints, which demonstrates their continued interest in pursuing the investigation.  (Opp. Mem. at 17.)  Accordingly, the court finds that the delays "were not the result of a 'deliberate attempt to delay the trial in order to hamper the defense.'"  *Smith v. La Clair*, 353 F. App'x 486, 488 (2d Cir. 2009) (quoting *Barker*, 407 U.S. at 531).

Petitioner also asserts that the FARU report from 2005 indicates respondent's negligence because the ADA should have realized then that only one palm print had been compared. (Reply at 4.)  As respondent points out, however, this only confirmed the People's assumption that the other prints remained unidentified.  (Opp. Mem. at 18.)

In *Innab*, the court found a pre-indictment delay of 28 years did not violate defendant's speedy trial right due to the serious nature of the charge, "the fact that the defendant remained at liberty for over 28 years—except for brief periods of incarceration on unrelated convictions—and the defendant's failure to demonstrate undue prejudice arising from the delay. . . ." *Innab*, 182 A.D.3d at 146.  Likewise, here, the charge of murder is very serious, and petitioner remained at liberty for the entire seven-year delay period save for his "periods of incarceration on unrelated convictions."  (Opp. to Mot. to Dismiss at 14.)

What was necessary to implicate petitioner for decedent's murder was "a complex investigation . . . requir[ing] examination of forensic evidence, expert opinion, and crime scene reconstruction."  (Opp. Mem. at 13.)  Between 2007 and 2010, new witness interviews were conducted, the petitioner was relocated, and the prosecution retained an independent fingerprint expert.  (Opp. Mem. at 18.)  As such, the instant case was one in which "pretrial delay is often both inevitable and wholly justifiable." *Doggett*, 505 U.S. at 656; *see also United States v. Kurti*, No. 11-CR-486 (DLI), 2013 WL 1663607, at *5 (E.D.N.Y. Apr. 17, 2013) (finding good cause for the lengthy delay "in light of the number of defendants, complexity and

30

number of charges in the indictment, ongoing plea negotiations, and substantial amount and complexity of evidence.").

For the aforementioned reasons, the court finds, on balance, that the government has shown good cause for the delay.

### 3. Petitioner's Assertion of His Speedy Trial Right

"The manner in which a defendant asserts his speedy trial right—the third *Barker* factor—is 'entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.'" *United States v. Swinton*, 797 F. App'x 589, 595 (2d Cir. 2019) (quoting *Barker*, 407 U.S. at 531-32) (summary order). The Second Circuit has stated the "inquiry is a fluid one that concerns itself with whether the government and the court were 'put on notice' that a defendant has asserted his right to a speedy trial." *United States v. Black*, 918 F.3d 243, 263 (2d Cir. 2019) (quoting *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 378 (2d Cir. 1979)).

Respondent asserts that "petitioner did not assert his right to a speedy trial until March 30, 2011, well after the complained-of delay [between 2003 and 2010] had ended." (ECF No. 5-1, Opp. Mem. at 19-20.) Moreover, respondent alleges that petitioner was released with a pending felony complaint during the seven-year delay and, further, "the prosecutor obtained an order for permission to obtain a DNA sample from petitioner"

after petitioner was released from incarceration.[6]  (*Id.*)

Therefore, respondent contends the instant circumstances

indicate petitioner's acquiescence to the delay and extenuate

the presumption of prejudice inherent in the delay.  (Opp. Mem.

at 20 (citing *Doggett*, 505 U.S. at 658).)

     Petitioner responds that he gave notice in 2003 that

he was not waiving his right to a speedy trial pursuant to CPL §

30.30.  (Reply at 6, 11.)[7]  However, as discussed earlier, CPL

§ 30.30 is inapplicable to a charge of murder, and as such, the

petitioner's express refusal to waive this right did not

establish nor assert the right to speedy trial.  *Wiggins*, 31

N.Y.3d at 11.  Petitioner even conceded this point earlier in

his reply brief.  (Reply at 1.)[8]

---

[6] Petitioner disagrees with respondents' claim that petitioner's DNA was
obtained after his release from incarceration.  The discrepancy appears to be
based on the fact that the DNA was taken after petitioner was released on the
murder charge with the docket pending, but while petitioner was still
incarcerated for the unrelated rape charge.  Petitioner was released on May
1, 2003, with a felony complaint pending in the instant matter.  Respondent
has previously asserted that petitioner still remained incarcerated on
unrelated charges and that it obtained the DNA order on May 8, 2003,
presumably during said unrelated incarceration.  (*See* Resp. Opp. to Mot. to
Dismiss at 15-16.)

[7] Petitioner attaches the May 23, 2003 proceedings as Exhibit A to his reply
which states in relevant part:
     The Court: 30.30, 20 not being waived?
     Mr. Duval: Not at this time.
The court finds the reference to § 30.30 to be harmless error by the trial
court.

[8] Furthermore, the court notes that "even if petitioner's statutory speedy
trial right was violated, petitioner has failed to raise a constitutional
claim that is cognizable on federal habeas corpus review."  *Rodriguez v.
Superintendent, Collins Corr. Facility*, 549 F. Supp. 2d 226, 237 (N.D.N.Y.
2008) (quoting *Wilson v. Goord*, No. 00-Civ-4849 (LTS), 2004 WL 226149, at *4
(S.D.N.Y. Feb.6, 2004)); *see also Gibriano v. Atty. Gen. of the State of New
York*, 965 F. Supp. 489, 491-92 (S.D.N.Y. 1997) (holding that "Section 30.30
is a statutory time in which the People of New York must be ready for

Petitioner further contends that he "vigorously" asserted his speedy trial rights, as indicated by his *pro se* speedy trial motion in January 2011, petitioner's second speedy trial motion in March 2011, and petitioner's state *habeas corpus* petition in December 2011, all of which were denied.  (Reply at 6.)  The first of these motions was brought seven years after his initial arrest and release, and one month after the indictment dated December 2, 2010.  Thus, petitioner first attempted to assert his right to a speedy trial by a motion in January 2011.  *See Rayborn*, 858 F.2d at 93 ("[T]he lack of timeliness, vigor, or frequency of [a defendant's] assertions militates against according them strong evidentiary weight."); *see also United States v. Vasquez*, 918 F.2d 329, 338 (2d Cir. 1990) ("[B]oth defendants waited roughly 22 months before advancing their speedy trial claims, and this hardly renders plausible their contention that an expeditious resolution of their cases was a matter of pressing constitutional importance for them.").

The Second Circuit has previously found it "simply inconceivable [that] the government was not 'put on notice'", where the defendant "requested his speedy trial so frequently and vociferously."  *Swinton*, 797 F. App'x at 595 (quoting *U.S.*

---

trial; Section 30.30 is not, as such, a statutory embodiment of the constitutional guarantee to a speedy trial.").

*v. Tigano,* 880 F.3d 602, 617 (2d Cir. 2018)).  Unlike in those cases, petitioner raised the speedy trial issue to the court for the first time in 2011, seven years after his arrest, during which time he had been released docket pending, and as such, did not frequently and vociferously assert his right to a speedy trial during the time between his arrest and indictment.  *Id.* (weighing factor in favor of government because defendant "raised the issue to the court for the first time 53 months after his arrest and who therefore did not frequently and vociferously assert his right to a speedy trial").

Therefore, the court concludes that petitioner has not met his burden to show that he asserted his right to a speedy trial, and this factor weighs in favor of respondent.

### 4. Prejudice to Petitioner's Defense

Justice Rienzi determined that petitioner's prejudice claim was "purely speculative," a finding affirmed by the Appellate Division.  (Rienzi Order at 6; App. Div. Decision at 2.)  In *Doggett*, the Supreme Court identified three principal types of harm that potentially arise from the "unreasonable delay" between formal accusation and trial: (1) "oppressive pretrial incarceration," (2) "anxiety and concern of the accused," and (3) "the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence."  505 U.S. at 654 (quoting *Barker*, 407 U.S. at 532)

(brackets omitted).   "Where the defendant asserts prejudice, either general or particularized, as a result of a delay, the Government has an affirmative burden to rebut that claim." *United States v. Ostroff*, 340 F. Supp. 2d 362, 368 (S.D.N.Y. 2004) (citing *Doggett*, 505 U.S. at 658).

To the extent that petitioner claims "oppressive pretrial incarceration," *Doggett*, 505 U.S. at 654, he cannot successfully claim prejudice because petitioner's incarceration was concurrent with another sentence.   *United States v. Lainez-Leiva*, 129 F.3d 89, 92 (2d Cir. 1997) ("Nor can [defendant] claim prejudice traceable to any oppressive pretrial incarceration, because he would have been serving his state sentence in any event."); *see also* Rienzi Order at 5-6 ("[E]ven though [petitioner] was arrested on the subject case in 2003, his minimal period of incarceration was concurrent with the separate and unrelated rape case."); App. Div. Decision at 2 (noting same).

Petitioner further alleges he suffered prejudice due to "anxiety and concern of the accused."  *Doggett*, 505 U.S. at 654.   Petitioner points to *United States v. Dreyer* to assert that the term prejudice includes "any threat to . . . 'an accused's significant stakes psychological, physical and financial in the prompt termination of a proceeding which may ultimately deprive him of life, liberty or property."  533 F.2d

112, 115 (3d Cir. 1976) (quoting *United States v. Roberts*, 515
F.2d 642, 645 (2d Cir. 1975)).  Petitioner has not, however,
proffered any tangible evidence to indicate that there was
significant "anxiety and concern" stemming from his 2003 arrest
and the resulting delay beyond a general showing of factors that
"are inevitably present in every [criminal] case to some extent
. . . ." *Barker*, 407 U.S. at 537 (White, J., concurring).

Regarding the potential impairment of the accused's
defense due to "dimming memories and loss of exculpatory
evidence," *Doggett*, 505 U.S. at 654, petitioner alleges that his
defense was impaired "due to lost witnesses and two videos," one
across the street from the crime scene, and another at the hotel
where petitioner alleges that he was staying, in addition to
"nine kids playing football right outside of the house when I
left, and people on their porches . . . ."  (Reply at 7.)

First, petitioner did not allege the existence of this
security footage or witnesses on direct appeal.  (*See* Pet.
Speedy Trial Mot. at 26-27; *see also* Appellate Brief at 53-54;
Attachments at 53-55 (Respondent attached DD5s containing police
interviews with petitioner in which he made no mention of
potential witnesses nor videos).)  Further, petitioner "has not
provided the identity of any alleged witnesses and does not
offer any concrete evidence of any prejudice."  (Rienzi Order at
6.)  Second, although petitioner alleged a security video was

36

lost,[9] Justice Rienzi found that "[petitioner] neither details the video's location nor explains how he has such information[,]" and that the allegation is undermined by the fact that "the originally assigned detectives [] looked for any surveillance videos and [were] unable to locate any cameras near the subject location." (*Id.* at 6-7.)[10]

Consequently, the court independently concludes and also defers to the state courts' determinations that petitioner has failed to satisfy the showing of prejudice. *See Doggett,* 505 U.S. at 656 (finding that a government's showing of reasonable diligence could defeat a defendant's speedy trial claim "so long as [the defendant] could not show specific prejudice to his defense").

### 5. Balancing the Factors

As previously noted, "none of the four factors identified [] [are] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together

---

[9] "[A] security surveillance video from September 4, 1999, that showed [petitioner] as he entered and left the apartment and noted the times at which this occurred." (Pet. Speedy Trial Mot. at 26-27.)

[10] This assertion was not originally evidenced by any exhibits on the record. Rather, respondent alleged that, "[a]s a known fact, there was no video anywhere near the apartment of Noemi Ortiz, the murder scene. The detectives assigned to this case in 1999 and who worked the case till 2003 . . . originally canvassed the area or eyewitnesses and video that would provide evidence for this crime. They found neither." (Opp. to Mot. to Dismiss at 33.)

with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533.

Though Justice Rienzi found that the delay was substantial, the nature of the underlying charge was serious and the defendant had only been incarcerated for six days, concurrent with another sentence, prior to indictment. (Rienzi Order at 5.)  The judge afforded considerable weight to respondent's "cogent" reasons for the delay and "good faith when they decided not to initially prosecute this matter," as well as the "purely speculative" nature of petitioner's claimed prejudice. (*Id.* at 6.)

Because the court finds that the state courts' decisions denying petitioner's speedy trial challenges were not "contrary to" clearly established Federal law, nor did those decisions result in a decision that was based on an unreasonable determination of the facts, the court finds no reason to disturb the state courts' decisions.  28 U.S.C. § 2254(d); *Innab*, 182 A.D.3d at 142.

### B. Due Process

#### i.   Legal Standard

"Under certain limited circumstances . . . a pre-indictment delay may amount to a due process violation" under the Fifth and Fourteenth Amendments.  *See United States v. Brown*, No. 18-CR-6119CJS, 2020 WL 2602082, at *7 (W.D.N.Y. May

22, 2020) (citing *Marion*, 404 U.S. 307, 322 (1971)); *see also United States v. Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1979). To establish a due process violation based upon a theory of pre-indictment delay, a defendant must prove: "(1) that the delay caused substantial prejudice to their right to a fair trial, and (2) that the delay was an intentional device to gain tactical advantage over the accused." *United States v. Oliver*, 683 F. Supp. 35, 40 (E.D.N.Y. 1988) (citing *Marion*, 404 U.S. at 324); *see also United States v. Snyder*, 668 F.2d 686, 689 (2d Cir. 1982). Prejudice means "that sort of deprivation that impairs a defendant's right to a fair trial," which "is commonly demonstrated by the loss of documentary evidence or the unavailability of a key witness." *See United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999) (citing *Elsbery*, 602 F.2d at 1059).

### ii. Application

Petitioner claims he was deprived of his right to due process because of the delay between the crime in 1999 and his subsequent belated arrest in 2003. (Pet. at 1-2.)[11]  It appears

---

[11] The court notes that petitioner raised this claim in both his 2011 state court motion and his direct appeal.  However, it appears that neither court discussed it in their decisions.  Regardless, the state courts are entitled to receive deference as to their determinations. *See Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

that petitioner did not ever raise the argument that the delay
was done intentionally, and Justice Rienzi found that "there was
no indication the prosecution deliberately delayed to gain [a]
tactical advantage." (Reply at 6.) Rather, petitioner
consistently alleges that respondent was negligent in causing
the delay. (Reply at 1, 4-5.)

The court finds that petitioner's resounding
accusations of respondent's negligence are fatal to his due
process claim. To make out a due process violation, a
petitioner must show that it was respondent's deliberate intent
to delay petitioner's indictment. *See Salcedo v. Phillips*, No.
04-CV-7964 (PAC) (GWG), 2007 WL 3097208, at *4 (S.D.N.Y. Oct.
22, 2007) (quoting *United States v. Silberstein*, No. 02-CR-800
(SWK), 2003 WL 21488024, at *4 (S.D.N.Y. June 27, 2003)) ("Even
assuming the delay was caused entirely by the NYPD's lack of
diligence, rather than [the petitioner's] own actions, such a
lack of police diligence does not constitute a due process
violation absent 'evidence that the Government engaged in any
deliberate actions to delay the indictment in this case for its
own benefit.'"); *see also Oliver*, 683 F. Supp. at 41 (finding no
due process violation even though the prosecution of the case
was "anything but diligent").

Accordingly, petitioner's due process claim is
respectfully denied.

## II.  Denial of Right to a Fair and Impartial Jury

### A. Legal Standard

Under the Sixth Amendment, a criminal defendant is afforded the right to be tried by an "impartial jury."  U.S. Const. amend. VI.  The "right to jury trial has been recognized by our courts as our 'most priceless,'" which "guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors[.]'"  *United States v. Parse,* 789 F.3d 83, 124 (2d Cir. 2015) (Straub, J. concurring) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).  A petitioner must "establish[] the partiality of the jury that ultimately convicted him . . . ."  *United States v. Towne*, 870 F.2d 880, 885 (2d Cir. 1989).  Moreover, "'due process does not require a new trial every time a juror has been placed in a potentially compromising situation.'"  *Garner v. Lee*, No. 11-CV-00007 (PKC), 2019 WL 4575377, at *3 (E.D.N.Y. Sept. 20, 2019) (quoting *Gouvatsos v. Ercole*, No. 09-CV-1449 (SJF), 2012 WL 3685977, at *13 (E.D.N.Y. Aug. 23, 2012)).

Under § 2254(d), the state court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial."  *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (citing *Wheel v. Robinson*, 34 F.3d 60, 65 (2d Cir. 1994).  "The touchstone for courts deciding such issues on federal habeas review is 'whether there is fair support in the

record for the state court's conclusion that the jurors in a trial would be impartial.'" *Montanez v. Tynon*, No. 18-CV-1766 (JPO) 2018 WL 6268221, at *13 (S.D.N.Y. Nov. 30, 2018) (quoting *Sullivan v. Lee*, No. 10-CV-425, 2017 WL 3634598, at *9 (E.D.N.Y. Aug. 22, 2017)).  Accordingly, the United States Supreme Court has held that "the trial court's findings of impartiality [may] be overturned only for 'manifest error.'" *Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (quoting *Irvin*, 366 U.S. at 732); *see also Hicks v. Bellnier*, 43 F. Supp. 3d 214, 233-34 (E.D.N.Y. 2014).

### B. Application

Petitioner asserts he was denied his constitutional right to a fair and impartial jury because Justice Collini refused to discharge the entire jury venire.  (Pet. at 2.) Petitioner argues that the venire included potential jurors who had been exposed to a news article, which contained prejudicial information about petitioner's criminal history, including the unrelated rape case which had been barred from use during his murder trial.  (*Id.*)  Petitioner speculates that, although one juror admitted that she read the article and discussed it with a few other prospective jurors, "some of them failed to come forward" and were permitted to sit on the jury that ultimately convicted petitioner.  (*Id.*)  Respondent asserts that petitioner's claims were raised and rejected on appeal, and the

state court findings are now entitled to deference.   (Opp. Mem.
at 23 (citing *Sellan v. Kuhlman*, 261 F.3d 303, 311-12 (2d Cir.
2001).)   Additionally, respondent argues that: (1) the case does
not involve "pervasive and concentrated" publicity; (2) the
nature of the pretrial publicity was fairly neutral; and (3)
there is no evidence that the article was widely available to
the jurors.   (*Id.* at 23-28.)

With respect to pretrial publicity, the Supreme Court
has held that, "even if pervasive and concentrated, [it] cannot
be regarded as leading automatically and in every kind of
criminal case to an unfair trial." *Nebraska Press Ass'n v.
Stuart*, 427 U.S. 539, 565 (1976).   The Second Circuit has set
forth "general guidelines for a trial judge" where media trial
publicity may be a concern.   *United States v. Chang An-Lo*, 851
F.2d 547, 558 (2d Cir. 1988) (citing *United States v. Gaggi*, 811
F.2d 47, 51 (2d Cir. 1987)).   "The trial judge should first
determine whether the coverage has a potential for unfair
prejudice." *Id.*

Here, it is undisputed that the article contained
prejudicial information concerning petitioner's prior rape
conviction and the case.   (Voir Dire at 110-11.)   "Next, the
jury should be canvassed to ascertain if they have learned of
the potentially [prejudicial] publicity . . . ." *Gaggi*, 811
F.2d at 51.   In the instant matter, Justice Collini probed

further into the venire's exposure to the article.  (Voir Dire
at 114, 118, 120, 140, 143-44.)  Then, if it is discovered that
any juror was exposed to such publicity, he or she "should be
examined individually, out of the presence of the other jurors,
to determine the extent of the exposure and its effect on the
juror's attitude toward the trial." *Chang An-Lo*, 851 F.2d at
558 (quoting *United States v. Lord*, 565 F.2d 831, 838-39 (2d
Cir. 1977)).  Justice Collini properly and individually
questioned the potential jurors who gave responses calling into
question their exposure to the article and its effect on their
impartiality.  (*Id.* at 129-135.)

        Once these precautionary measures have been taken by
the trial court, "the trial judge can then determine whether any
further steps are necessary to ensure a fair trial." *Lord*, 565
F.2d at 839.  In response to Justice Collini's inquiry, Juror
Braggs stated she would be able to decide the case fairly and
impartially. (Voir Dire at 134-35.)  Justice Collini even took
further measures to clarify any potential ambiguity concerning
Braggs' answer.  (*Id.*)  Juror Braggs then affirmatively stated
that she would be able to judge the case based solely on the
evidence or lack thereof that she heard in the courtroom. (*Id.*
at 135.)   In the instant case, Justice Collini determined that
her responses were satisfactory. (Voir Dire at 143.)  Out of the
eight potential jurors who had admitted that they had been

exposed to the article either directly or indirectly, four jurors were dismissed for cause and the other four jurors gave the court unequivocal assurance of their impartiality, which Justice Collini deemed satisfactory.

Petitioner, both on appeal and presently, has not proffered "clear and convincing" evidence that any jurors were not impartial and, instead, merely argues that other jurors may have been exposed to the prejudicial information.  The record does not indicate that the trial court's actions constituted "manifest error." *Hicks*, 43 F. Supp. 3d at 234; *United States v. Elfgeeh,* 515 F.3d 100, 129 (2d Cir. 2008) ("If [the *Gaggi*] process is followed, [courts] may presume, in the absence of any indication to the contrary, that the jurors have followed the court's instructions and have rendered their verdict solely on the basis of the evidence at trial."); *see also United States v. Cox,* 324 F.3d 77, 87 (2d Cir. 2003) (noting "a court should generally presume that jurors are being honest")); *United States v. Ashburn*, No. 11-CR-303 NGG, 2015 WL 5098607, at *56 (E.D.N.Y. Aug. 31, 2015) (denying relief where jurors were presumed to be impartial since petitioner proffered no evidence that the jury failed to follow the court's instructions).

Petitioner has not overcome the presumption of correctness regarding the state court's impartiality

determinations, and there is no indication that the determinations were contrary to, or involved an unreasonable application of federal law.  Accordingly, petitioner's claim regarding the denial of his right to a fair and impartial jury is respectfully denied.

### III. **Ineffective Assistance of Counsel**

#### A. Legal Standard

The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense."  U.S. Const. Amend. VI.  "[T]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  Under the prevailing test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), to bring an ineffective assistance of counsel claim, a plaintiff must show: (1) that counsel's performance was objectively unreasonable; and (2) that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. 668, 694 (1984).

The bar is set quite high for a defendant seeking to show objectively unreasonable performance by counsel under the first requirement.  "Constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate

assistance and made all significant decisions in the exercise of reasonable professional judgment.'"  *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690); *see also Brown v. Greene*, 577 F.3d 107, 110 (2d Cir. 2009).  In assessing performance, courts are directed to "eliminate the distorting effects of hindsight," and apply deference to counsel's judgments.  *Id.*  As a result, "the defendant must overcome the presumption that under the circumstances, the challenged action 'might be considered sound strategy.'"  *Strickland,* 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

With respect to the second prong, a petitioner must show that but for the attorney's deficient performance, there is a "reasonable probability" that the result would have been different.  *Strickland*, 466 U.S. at 693.  On the one hand, a "reasonable probability" of prejudice requires more than a mere showing that the errors had "some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."  *Id.*  On the other hand, a petitioner need not establish that the attorney's deficient performance "more likely than not" altered the outcome. *Gonzalez v. United States*, 722 F.3d 118, 130, 135 (2d Cir. 2013).

47

The *Strickland* standard is widely understood to be "highly demanding" and "rigorous," and the petitioner bears the burden of proving that both prongs are met. *Kimmelman v. Morrison*, 477 U.S. 365, 381-82 (1986); *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) ("The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard.").

The Second Circuit has held that, in the context of an ineffective assistance of counsel claim, the "procedure for determining whether a hearing is necessary is in part analogous to a summary judgment proceeding," in that "[i]f material facts are in dispute, a hearing should usually be held, and relevant findings of fact made." *Raysor*, 647 F.3d 491, 494 (2d Cir. 2011) (internal quotation marks and alterations omitted).  In assessing whether a hearing is needed, the court looks primarily to petitioner's affidavit to determine if the evidence would be admissible proof entitling him to relief; therefore, "[m]ere generalities or hearsay statements will not normally entitle the applicant to a hearing." *D'Ercole v. United States*, 361 F.2d 211, 212 (2d Cir. 1967).

In addition, it is well-established that the district court may decide a petition under 28 U.S.C. § 2255 without an evidentiary hearing, based on a review of documented accumulated

during pre-conviction litigation, including a trial transcript, particularly where petitioner does not raise a material issue of fact. *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001); *United States v. Jennings*, 10-CV-6119, 2014 WL 2531951, at *5 (W.D.N.Y. Apr. 19, 2014) ("Following review of transcripts, the presentence investigation report, and information submitted by the defendant in support of, and by the government in opposition to, [2255 petition], the Court determines that no hearing is warranted."); *Ramirez v. United States*, 185 F. Supp. 2d 246, 265 (E.D.N.Y. Nov. 5, 2001) (holding that no evidentiary hearing was required when court had complete trial transcript and parties' briefings).

The district court has discretion to make a decision that "avoid[s] delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing." *Chang*, at 86; *see also Machibroda v. United States*, 368 U.S. 487, 495 (1962) ("[Habeas] statute itself recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner."). In particular, courts have expressed skepticism regarding the credibility of a defendant's post-conviction statements that he would have pleaded guilty to

49

a tendered plea offer.  *Purdy v. Zeldes*, 337 F.3d 253, 259 (2d
Cir. 2003) ("[I]n most circumstances a convicted felon's self-
serving testimony is not likely to be credible."); *United States
v. Gordon*, 156 F.3d 376, 380-81 (2d Cir. 1998).

### B. Application

#### i.   Performance Prong

Petitioner argues that his counsel's failure to
peremptorily challenge Juror Braggs deprived petitioner of his
right to effective assistance of counsel.  (Pet. at 2.)
Respondent asserts that this claim was raised and rejected on
direct appeal, and should thus be denied because the state
courts' decisions are entitled to deference.  (Opp. Mem. at 23.)

Petitioner's counsel was present for both of Justice
Collini's inquiries of Juror Braggs, and had the option of
challenging any prospective juror.  *See United States v.
Collins*, 665 F.3d 454, 463 (2d Cir. 2012) (citing *United States
v. Gagnon*, 470 U.S. 522, 523-24 (1985) (finding assistance of
counsel was not ineffective where interview with juror narrowly
tailored to address misconduct and juror's ability to be
impartial; counsel present and permitted to question juror).

Petitioner has not articulated a sufficient basis to
find that his counsel's failure to strike Juror Braggs falls
outside the range of professional competence.  "[A]n attorney's
actions during voir dire are considered to be matters of trial

strategy," *Charlemagne v. Goord*, No. 05 Civ. 9890 (DAB) (HBP) 2008 WL 2971768, *27 (S.D.N.Y. June 30, 2008), and "courts afford wide latitude to attorneys who object to some jurors and not others," *Hicks v. Ercole*, No. 09-CV-2531 (AJN), 2015 WL 1266800, at *26 (S.D.N.Y. Mar. 18, 2015).  *See Guerrero v. Payant*, No. 08-CV-03062 (JFB), 2010 WL 2545818, at *20 (E.D.N.Y. June 21, 2010) ("The exercise of or failure to exercise a peremptory challenge may be considered trial strategy employed by the attorney."); *see also Figueroa v. Heath*, No. 10-CV-0121 (JFB), 2011 WL 1838781, at *13 (E.D.N.Y. May 13, 2011) ("[A] contention that defense counsel was ineffective for failing to challenge a prospective juror for cause or to exercise a peremptory challenge with respect to that prospective juror does not by itself constitute ineffective assistance." (quoting *Jones v. Poole*, No. 05-CV-0886 (VEB), 2010 WL 1949599, at *33 (W.D.N.Y. May 13, 2010))); *Doleo v. Reynolds*, No. 00-CV-7927, 2002 WL 922260, at *4-5 (S.D.N.Y. May 7, 2002) ("Strategies as to the exercise of peremptories are matters of counsel's intuition, and do not rise to the level of constitutional error.").

The record shows that petitioner's counsel peremptorily challenged three out of the nine prospective jurors.  Moreover, jury selection ended without petitioner's counsel exhausting his available peremptory challenges (Voir

Dire at 365-70), which may suggest that "his decision . . . was part of a trial strategy that might be considered sound." *Rodriguez v. Breslin*, No. 05-CV-1639 (RRM), 2009 WL 424738, at *9 (E.D.N.Y. Feb. 20, 2009) (citations and internal quotation marks omitted); *see also Nova v. Ercole*, 06 CV 562 (NRB), 2007 WL 1280635, at *8 (S.D.N.Y. Apr. 30, 2007) ("Counsel exercised two peremptory challenges for other prospective jurors ... [t]his suggests that counsel deliberately chose not to challenge [the juror in question] as part of trial strategy."); *Guerrero*, 2010 WL 2545818, at *21 ("[I]t appears from the voir dire, as a whole, that defense counsel made a strategic decision [to] not use peremptory challenges on these two jurors."). Thus, petitioner's counsel's choice not to exhaust peremptory challenges suggests a strategic choice that does not clearly fall outside the wide range of professionally competent assistance.

Furthermore, petitioner's counsel specifically requested that only one of the three prospective jurors be dismissed for-cause. (Voir Dire at 139.) Though petitioner's counsel renewed his request to have the entire venire excused before specifically requesting that the juror be dismissed for cause, this does not undermine his decision to keep Juror Braggs on the panel. *See United States v. Martinez-Salazar*, 528 U.S. 304, 306 (2000) ("After objecting to the [trial court's] denial

of his for-cause challenge, [petitioner] had the option of letting [the juror] sit on the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal.  Instead, he elected to use a challenge to remove [the juror] . . . . This was [petitioner's] choice.").  In the instant matter, petitioner's counsel chose not to peremptorily challenge Juror Braggs.  As a matter of law, this choice—to keep Juror Braggs on the jury—can be construed as a sound "strategic decision." *Guerrero*, 2010 WL 2545818, at *21; *Bierenbaum v. Graham*, 607 F.3d 36, 50-51 (2010).

Because petitioner has not identified any acts or omissions on the part of his counsel that were outside the range of professionally competent assistance, *Strickland,* 466 U.S. at 690, the court finds that the Appellate Division's decision was not constitutionally ineffective.

### ii.  **Prejudice Prong**

Because petitioner has failed to allege counsel's deficient performance, his ineffective assistance claim must fail.  *Gonzalez*, 722 F.3d at 130.  Nevertheless, the court also notes that petitioner has failed to satisfy the prejudice prong under *Strickland*.  *Strickland*, 466 U.S. at 687.

In the context of a defense counsel's failure to exercise a peremptory challenge, a petitioner "must show that

53

the juror was actually biased against him" in order to show prejudice.  *Guerrero*, 2010 WL 2545818, at *22.

Petitioner avers that the contents of the article in question, to which Juror Braggs was indirectly exposed, were specifically barred from being used at trial by the judge because "this information was no[t] only related to the case, [but] it was also highly prejudicial."  (Reply at 8.) Petitioner, however, does not point to any evidence of Juror Braggs' bias towards petitioner and, upon looking at the record, the court can find none.  Juror Braggs asserted that she had not read the article herself and, rather, had a "brief talk" with Ms. McInery and "[i]t wasn't like she was on a subject for long. She just spoke of it briefly."  (Voir Dire at 134.)  Further, petitioner's counsel additionally inquired as to whether Ms. McInery had an article or anything in her hands when she spoke to the three prospective jurors and Juror Braggs responded by saying "Not that I recall.  I don't remember."  (*Id.* at 135.) Furthermore, Juror Braggs expressly asserted that she had not heard or read anything that would affect her ability to be impartial. (*Id.* at 134-35.)  Juror Braggs also stated that she would judge the case based solely on the evidence presented at trial (*id.* at 135), and that she "can keep an open mind" when listening to a witness with past criminal convictions (*id.* at 219.)  Judge Collini found these responses indicated Juror

Braggs' impartiality, and neither party sought a for-cause challenge to Juror Braggs.  (*See id.* at 143.)

The aforementioned exchanges reveal no indications of Juror Braggs' bias against petitioner and no indication that, had petitioner's counsel peremptorily challenged her, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687.  Because petitioner fails to satisfy either *Strickland* prong, petitioner's claim for ineffective assistance of counsel is denied.  *See Belgrave,* 2014 WL 12746908, at *6-7; *Nova*, 2007 WL 1280635, at *7-9; *Figueroa,* 2011 WL 1838781, at *13-15; *Guerrero*, 2010 WL 2545818, at *20-23.

## Conclusion

For the foregoing reasons, petitioner's petition for a writ of habeas corpus is respectfully DENIED and DISMISSED. The court certifies pursuant to 28 U.S.C. Section 1915(a)(3) that any appeal would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of the Court is respectfully requested to enter judgment in favor of respondent and serve a copy of this Memorandum and Order and the judgment on *pro se* petitioner, note service on the docket, and close the case.

**SO ORDERED.**

```
_____/s/_____
Kiyo A. Matsumoto
United States District Judge
```

Dated: August 4, 2020
      Brooklyn, New York